PEOPLE ET AL., PETITIONERS, *v.* ARRILLAGA, RESPONDENT.

PETITION for a Writ of Mandamus Directed to the District Attorney for the First District of San Juan.

No. 207.—Decided July 13, 1922.

MANDAMUS—TRANSFER OF DISTRICT ATTORNEY—POWER OF ATTORNEY GENERAL—CONTROL OF GOVERNOR.—A writ of mandamus does not lie to compel a district attorney to obey an order of transfer received from the Attorney General when that order was revoked by the Governor in the exercise of the power of supervision and control over all executive departments of the Government conferred upon him by sections 12 and 13 of the Organic Act.

ID.—It is a principle unanimously accepted by the decisions of the American courts that in order that a mandamus may issue it must appear *prima facie* that there is no other adequate remedy, for the object of the writ is not to substitute legal remedies, but to supply the lack of them.

ID.—It is an indispensable requisite in petitioning for a writ of mandamus to show that the act to be done or the duty to be performed is a peremptory or ministerial one, as distinguished .from those acts or duties which are discretional.

The facts are stated in the opinion.

*The Attorney General* and *Messrs. M. A. Muñoz* and *J. A. Loret* for the petitioners.

*Messrs. J. B. Soto, A. Aponte* and *R. Martínez Nadal* for the respondent.

Personal opinion of MR. JUSTICE FRANCO SOTO.

On May 31, 1922, the Attorney General of Porto Rico ordered the transfer of the district attorney for the Judicial District of San Juan, First District, to the Judicial District of Mayagüez, the order reading as follows:

"Department of Justice of Porto Rico.—Office of the Attorney General.—San Juan, May 31, 1922.—Hon. Rafael Arrillaga Urrutia, District Attorney for the First District of San Juan.—Sir:—By virtue of the authority vested in me by law I hereby order you to transfer immediately to the District of Mayagüez and take charge of the district attorneyship of the said district pending further orders from this Department, first delivering all matters now under your supervision to ·Hon. Domingo Massari, District Attorney for the Second District of San Juan.—Respectfully, Salvador Mestre, Attorney General."

District attorney Arrillaga impliedly indicated his intention not to comply with the order of transfer, for although he did not answer the Attorney General directly, on June 2, 1922, he filed in the District Court of San Juan, First District, the following petition:

"First Judicial District of San Juan.—In the District Court.— *Ex parte* the District Attorney for the First District of San Juan, Petitioner.—No. 908.—Petition.—Now comes the undersigned district attorney before this honorable court and respectfully alleges: That on this day the undersigned filed a motion in the office of the clerk of this court which substantially prays the court to order the Attorney General of Porto Rico, or any of his assistants, to deliver to the undersigned · district attorney all of the papers and documents

relating to the report made by the grand jury against E. Mont.
Reily, J. R. Hull and W. Kessinger.

"That about an hour ago I received a communication from the
Attorney General ordering my transfer to Mayagüez after delivering
to district attorney Domingo Massari all of the papers, documents
and archives of this office; that inasmuch as the Attorney General's
communication does not conform to the provisions of sections 64
of the Political Code and 49 of the Jones Act, the latter, in the
opinion of the undersigned, superseding said section 64 of the Political
Code, the said communication from the Attorney General is of no
effect and, therefore, I continue as the district attorney for the
Judicial District of San Juan, First District. And as such district
attorney for the First District of San Juan, I hereby ratify the
motion filed in the clerk's office and pray the court to enter an
order on its merits.—San Juan, P. R., June 2, 1922. (Signed) Rafael Arrillaga Urrutia, District Attorney for the First District.''

By reason of the express refusal of district attorney Arrillaga as evinced by the foregoing motion, the Attorney General petitioned this court for a peremptory writ of mandamus directed to Rafael Arrillaga Urrutia, District Attorney for the Judicial District of San Juan, First District, and commanding him to comply forthwith with the order of transfer quoted above.

This court issued a rule in accordance with section 6 of the Mandamus Act of 1903, for the respondent to appear to show cause, if any he have, why the writ of mandamus prayed for should not issue. At the hearing the respondent set up various reasons in support of his refusal and specially alleged the following:

"And the respondent finally alleges in opposition to the said
petition and the relief therein prayed for that on the 6th of June,
1922, the Governor of Porto Rico wrote to him the following letter
which he received on the 7th day of the same month:

" 'San Juan, Porto Rico.—June 6, 1922.—Hon. Rafael Arrillaga,
Fiscal of the First Judicial District of San Juan, San Juan, P. R.—
Dear Sir:—Whereas it has been called to my attention that the
Attorney General of Porto Rico has ordered your transfer as Fiscal
from the 1st District of San Juan, Porto Rico, to the District of

Mayagüez, and no good cause appearing therefor, and none being given by the Attorney General for such transfer, and you were not appointed or commissioned as Fiscal of the Mayagüez district, but as Fiscal of the First District of San Juan, and whereas the Political Code of Porto Rico anly authorizes the Attorney General to transfer Fiscals for special causes shown, and no good reason has been given, but on the contrary it appears that said order was not made according to law.—Now, therefore, under and by virtue of the authority vested in me by section 12 of the Organic Act, I hereby set aside and rescind said order, and direct that you attend to the duties of the office ap‐ pointed and commissioned by me.—Done at my office in the city of San Juan this 6th day of June, 1922.—(Sgd.) E. Mont. Reily, Gov‐ ernor.' "

The order of the Attorney General is based on section 64 of the Political Code, subdivision 2 of which reads as follows:

"The Attorney General in special cases may require the fiscal of one district to exchange places with the fiscal of another district for such time as to the Attorney General may seem necessary."

The petitioner also cites section 14 of our Organic Act, as follows:

"Section 14.—That the Attorney General shall have charge of the administration of justice in Porto Rico;   *   *   * ."

The Attorney General alleges that these statutes would be a sufficient basis for the order imposing upon district at‐ torney Arrillaga the duty of proceeding to the judicial dis‐ trict of Mayagüez.

Section 64 of the Political Code *prima facie* confers upon the Attorney General the power to order the transfer of a district attorney from one district to another, but that power is not arbitrary and the statute itself limits it to special cases. However, there is in this case such a special circum‐ stance that the question arising from said section 64 has not all the importance that it could have had in so far as its scope and construction at this time are concerned, inasmuch as the Governor's intervention revoking the order of transfer given

by the Attorney General to district attorney Arrillaga presents the legal problem before us in a different light and, in our opinion, changes the situation entirely. The question, then, has taken another turn and what we have before us for decision is a conflict which we may call domestic within the same department of the government, that is, the executive branch. In such circumstances our question is: Can we interfere in and give a solution to a purely administrative controversy? Would not the issuance of a writ of mandamus in this case be a reversal of the order of the Governor of Porto Rico who is vested with the supreme executive power? The fact that that power is supreme does not warrant an interpretation that it may be exercised arbitrarily. It is a truth which, fortunately, can not be denied that we are living under a government of law and these controversies so indicate; therefore, we could not ignore the provision of section 64 of the Political Code if there were not another provision in our Organic Act which is paramount and perhaps limits or even supersedes the effects of the former. Section 12 of our Organic Act provides that the Governor "shall have general supervision and control of all the departments and bureaus of the Government in Porto Rico, so far as is not inconsistent with the provisions of this Act." We think that the provision of the Organic Act on this point is not inconsistent with section 14 of the same Act which prescribes that the Attorney General shall have charge of the administration of justice in Porto Rico. This is a logical result of the nature of the office of legal adviser of the Government, but the language used in the Act does not involve a supremacy over the powers of the chief executive, because the Department of Justice is one of the branches of the executive power like the other departments to which section 13 of the Organic Law refers. Section 13 reads as follows:

"Section 13. — That the following executive departments are hereby created: A Department of Justice, the head of which shall

be designated as the Attorney General; a Department of Finance, the head of which shall be designated as the Treasurer; a Department of Interior, the head of which shall be designated as the Commissioner of Interior; a Department of Education, the head of which shall be designated as the Commissioner of Education; a Department of Agriculture and Labor, the head of which shall be designated as the Commissioner of Agriculture and Labor; and a Department of Health, the head of which shall be designated as the Commissioner of Health. The Attorney General and the Commissioner of Education shall be appointed by the President, by and with the advice and consent of the Senate of the United States, to hold office for four years and until their successors are appointed and qualified, unless sooner removed by the President. The heads of the four remaining departments shall be appointed by the Governor, by and with the advice and consent of the Senate of Porto Rico. The heads of departments appointed by the Governor shall hold office for the term of four years and until their successors are appointed and qualified, unless sooner removed by the Governor.

"Heads of departments shall reside in Porto Rico during their official incumbency, and those appointed by the Governor shall have resided in Porto Rico for at least one year prior to their appointment.

"The heads of departments shall collectively form a council to the Governor, known as the Executive Council. They shall perform under the general supervision of the Governor the duties hereinafter prescribed or which may hereafter be prescribed by law and such other duties, not inconsistent with law, as the Governor, with the approval of the President, may assign to them; and they shall make annual and such other reports to the Governor as he may require, which shall be transmitted to the executive department of the Government of the United States to be designated by the President as herein provided; *Provided,* That the duties herein imposed upon the heads of departments shall not carry with them any additional compensation."

Sections 14 to 19 of the Organic Act prescribe clearly the duties of each of the heads of departments, beginning with those of the Attorney General, which, according to sections 12 and 13 already cited, shall be discharged under the control and supervision of the Governor as the supreme executive

authority. Each head of department is, as such head, in charge of everything connected with his department; thus, for example, the Commissioner of Health has charge of all matters relating to his department, and so with the other commissioners referred to in the Act. But these powers should coexist, when not limited or restricted, with those of the Governor as to the general supervision and control of such departments, and should not be inconsistent, of course, with other provisions of the same Organic Act.

We may say, therefore, that the language employed in the Organic Act to say that the Attorney General shall have charge of the administration of justice, does not make that department an autonomous and independent branch as against the power of supervision and control that the Organic Law vests in the Governor of Porto Rico with respect to each and all of the executive departments of the Government. Of course, the control of which the law speaks can never be arbitrary, for ''control'' must not be understood to mean to command without any restriction, but rather ''to govern, to prevent, to restrain, to regulate,'' which are the definitions given by Salvat's Dictionary to the word ''control.'' The control, according to the Organic Act, shall always be exercised consistently with the Act itself. Thus, each head of department has the control of the executive branch of which he is head and his power can not be arbitrary, but is limited by the Act itself. If within the executive power occurrences arise that constitute domestic or internal controversies of a purely administrative character, the judicial department is not called upon to interfere and solve the conflict or the abnormal situation created. We could compare such a situation with that which arose in the legislative department in the case of *De Diego et al.* v. *The House of Delegates,* 5 P. R. R. 110. In that case this Supreme Court, speaking through the illustrious Mr. Justice MacLeary, said:

"An application made to a judicial court for a *mandamus* against a legislative body, compelling it virtually to expel one or more of its own members, is an anomaly in American jurisprudence. No similar case can be found, so far as my investigation extends, in the annals of American litigation. Certainly no such case exists in the reports of the decisions of the Supreme Court of the United States."

In that case the petition for a writ of mandamus was based on a provision of the Political Code which mandatorily declared vacant the seat of a member of the House of Delegates who remained absent from his seat for more than five consecutive days without the permission of the House. The Political Code, in a preceptory manner, employed this language: "His office shall be deemed vacant." Yet, the Organic Law then in force, known as the Foraker Act, was in conflict with that provision of the Political Code and in this connection the Supreme Court said:

"Under the section of the law above quoted (section 30 of the Foraker Act) the House had the full power to consider and determine whether or not the seats mentioned were vacant, and as stated herein it has determined that fact in the negative, notwithstanding the language of section 210 of the Political Code above quoted." 5 P. R. R. 111.

It was further said in the same opinion, page 114 (Italics ours) :

"This language (*referring to the Constitution of the United States in defining the powers of Congress in section 5 of article 1*) is very similar to that above quoted from the Foraker Act, defining the powers of our Legislative Assembly, and perhaps such a provision in the Constitution, as well as the well-known independence of the legislative department of the National Government, has heretofore prevented any such application as the one here presented from being made to any court of the United States. It is plain from the absence of authorities on this point, and from the reading of the statute itself, and from the nature of the American scheme of government, that a *mandamus* will not lie in such a case as the one presented."

Thus we may say that notwithstanding the reasoned brief of the Attorney General, there may be observed in it an absence of authorities relating to cases similar to the present in the courts of the United States. And it could not be otherwise if we do not forget the American system of government which is founded on the wise principle of the independence and coordination of powers, a principle which, although now an elementary question in the experience of. the American government, was brought by Montesquieu as an actual science of government into the philosophical discussion contained in his work The Spirit of the Laws where the theory of the independence of powers is developed.

" 'The judicial and executive departments are made distinct and independent,' says Berry, J., 'and as neither is made responsible to the other for the performance of its duties, so neither can enforce the performance of the duties of the other.' The attempt on the part of some of the courts to interfere with the discharge of executive duties is not only in opposition to our theory of government and in excess of their power, but also attended with great danger. If the courts may interfere with the discharge of any ministerial duties of the executive department of the government, they may with all, and we should have the singular spectacle of a government run by the courts instead of the officers provided by the Constitution. Each department of the government is essentially and necessarily distinct from the others, and neither can lawfully trench upon or interfere with the powers of the other; and our safety, both as to National and State governments is largely dependent upon the preservation of the distribution of power and authority made by the Constitution, and the laws made in pursuance thereof. If the governor refuses or neglects to discharge his duties, exceeds his powers in flagrant cases, there is ample remedy by impeachment and removal from office. It is not believed that the courts have the power to discharge his duties for him, or to say what he shall or what he shall not do. Whatever may be the *power* of a court, it will exercise it very cautiously when called upon to interfere with the action of the executive officer of the State, and the right of the party to the relief sought must not only be beyond doubt or question, but it must also

appear that the officer has no discretionary power over the matter."
Wood on Mandamus, pp. 87 and 88.

The sound and admirable principles above quoted are beneficial and wholesome teachings applicable to the present controversy and lead us by the hand, as it were, especially considering the present circumstances, to the unavoidable duty of refusing, out of respect for the law and in order to maintain our prestige as an independent and harmonious power, to be drawn towards the whirlwind of domestic or administrative struggles within another department having also independence of action within the general coordination of powers.

It is a principle unanimously recognized by the jurisprudence of the American courts that in order that a mandamus may issue there must appear *prima facie* that there is no other adequate remedy in the law, for the object of the writ is not to substitute legal remedies, but to supply the lack of them.

"The relator must, therefore, have a clear legal right to the performance of a particular act or duty at the hands of the respondent, and it must appear that the law affords no other adequate remedy to secure * * * the performance of the duty it is sought to coerce." 2 Estee's Pleadings, 803.

We are of the opinion that there is another adequate and sufficient remedy and that remedy would be the removal of the defendant from office for disobeying the administrative order of his superior, the Attorney General; but it may perhaps be said that that remedy is not within the reach of the Attorney General and thus his recommendation to the Governor to that effect would be unfruitful, considering the abnormal circumstances of the case. But that is the conflict and we emphatically hold that the Supreme Court has no jurisdiction of it because our duty is simply to construe the laws and not to govern or to decide questions of an executive

nature which belong absolutely to the internal order of a
department as independent and respectable in its operation
as is our own department. If the Attorney General should
attempt to avail himself of that remedy and should give his
reasons therefor, it is not important that he should not attain
his object, for the decision would depend upon the authority
of the Governor with whom he is engaged in controversy. He
would have performed his duty, if he is in the right, and in
that case we may cite as applicable a portion of the argument
of Attorney General Cushing contained in 58 U. S. 287, as
follows:

"That the duty imposed by the constitution on the President, to
'take care that the laws be faithfully executed' absolutely requires
that he should have the power of removing unfit, negligent, disobe-
dient, or faithless officers; that without the power of removal, the
President would be without the means of performing the duty of
causing the laws to be faithfully executed; and if he had not the
means, he could not be justly held responsible for his failure."

So, therefore, if it is not within the power of the Attorney
General to remove the respondent, we could not, in justice,
hold him responsible because of his lack of means to do so.
The appointment of the Attorney General does not depend
upon the Governor. He is a presidential appointee and if in
his differences with his superior officer he should think that
the interests of justice are restrained, he can lay the facts
before the President of the Nation who has power to remove
the Governor as well as the heads of departments appointed
by him.

Besides, another indispensable requisite in an application
for a writ of mandamus is that the act to be done or the duty
to be performed is peremptory or ministerial in character,
as distinguished from those acts or duties that are discre-
tional. Our statute reads as follows:

"Section 2.—The writ of mandamus may be issued by the Su-
preme Court or the district courts, or any justice or judge thereof,

during the term or at chambers, to any inferior tribunal, corporation, board or person to compel the performance of any act which the law specially enjoins as a duty resulting from an office, trust or station, but though it may require an inferior tribunal, or any judge thereof, to exercise this judgment, or proceed to the discharge of any of its functions, it can not control judicial discretion." Acts of 1903, p. 113.

It may be deduced as a consequence of the statute transcribed that even if this court had authority to issue the writ of mandamus, it could not do so in this case because section 64 of the Political Code confers discretional power upon the Attorney General to issue the order of transfer to any district attorney of the Island or to revoke the order at his will, and also because there is a special district attorney who could at any moment attend to such an emergency as would justify a transfer. The authority conferred upon the Attorney General by the Political Code in this regard being discretional, its effects can not be considered as ministerial in issuing an order of transfer, and we would always have the same case to which we have referred above, *De Diego* v. *The House of Delegates,* wherein it may be seen that notwithstanding the peremptory and mandatory character of the provisions of the Political Code relied upon in the petition for a writ of mandamus, it was held that even then the action of the House was discretional and not merely ministerial, in which latter case only it might be controlled by the court by a writ of mandamus. The opinion of the court at page 114 says:

"In other words, if the Speaker of the House had the authority to declare the seat of a member vacant under certain conditions, acting in his discretion, a *mandamus* would not lie from any court to him, compelling him so to do; much less would a *mandamus* lie compelling the House to take such action."

And we may conclude by repeating words similar to the closing remarks of the decision just cited, thus: Therefore in no event could the object of the petitioner in this case be

accomplished by a writ of mandamus. This court would never attempt to assume jurisdiction which is not conferred upon it by law, and has no disposition to interfere with the rights and duties of other departments, such as the executive power in this case.

The writ should be denied.

*Writ denied.*

Chief Justice Del Toro and Justices Wolf and Hutchison concurred.

Mr. Justice Aldrey dissented.